[No. 55888–4. En Banc. March 22, 1990.]

KENNETH L. BINKLEY, *Appellant*, v. THE CITY
OF TACOMA, *Respondent*.

374

*Patricia Padilla Skrinar,* for appellant.

*Robert J. Backstein, City Attorney,* and *William J. Barker, Mark L. Bubenik,* and *George S. Karavitis, Assistants,* for respondent.

Durham, J.—Kenneth L. Binkley challenges the constitutionality of a municipality's employment decision. He alleges that the City of Tacoma (Tacoma) violated his right of free speech by reassigning him to another job after he lodged a complaint against his supervisor. He also alleges

that the working conditions at his new job constituted constructive discharge. In an action under 42 U.S.C. § 1983, the trial court found that Tacoma had retaliated against Binkley and awarded him damages, but also held that there was no constructive discharge. We reverse the section 1983 award and affirm the trial court on the constructive discharge claim.

So that a complete picture of the events in question is presented, we must relate the facts in some detail. Tacoma hired Kenneth L. Binkley in 1981. Binkley was employed as a clerk in the General Services Division of the Department of Public Utilities and was assigned to work in the garage. The garage serviced and stored the Department's vehicles. Binkley's duties at the outset included answering the telephone, logging the use of vehicles from the carpool, and processing purchase requisitions, delivery tickets, and employee time cards.

On August 1, 1983, the General Services Division hired W. Larry Kennedy as the new supervisor (fleet services manager) for the garage. When Kennedy was hired, the supervisor's job was expanded to include not only supervision of the garage's maintenance and repair functions, but also control of the entire fleet of vehicles, including acquisition and planning. Accordingly, Kennedy was to have less involvement with the garage than his predecessor. Whereas before responsibilities for the fleet were "quite fragmented", this change in duties was part of an overall plan to reorganize the garage into a single unit responsible for the fleet of vehicles.

Kennedy was Binkley's immediate supervisor from August 1, 1983 until June 6, 1984, when Binkley was reassigned. Over the course of this 10–month period, the working relationship between Kennedy and Binkley proceeded to deteriorate.

When Kennedy began his job in August 1983, he noticed that several tasks, for which Binkley was responsible, were not being timely performed. To remedy this situation, the

two men met to discuss Binkley's responsibilities, the status of those tasks, and to set a time for completion of those projects. Binkley failed to catch up on the backlog of projects. Consequently, Kennedy and Binkley met again to review the status of the projects. Binkley explained that he had not finished all of the work because there was too much for him to complete. At this point, Kennedy imposed a specific deadline to complete a particular project which Kennedy viewed as being of some importance. Binkley again failed to meet this deadline, which prompted Kennedy to prepare a memorandum regarding Binkley's unsatisfactory job performance. The memorandum was sent to Binkley and a copy was placed in his personnel file. This memorandum resulted in a complaint by Binkley and an eventual decision by Kennedy and Eric Herrmann (general services manager) to withdraw the memorandum from Binkley's file.

Difficulties with timely performance of Binkley's duties continued and steps were taken to attempt to relieve some of his workload. Although Kennedy had initially decided that the problem was simply one of overwork, he changed his mind later that year when a temporary worker who filled in while Binkley was on medical leave proved to be more efficient.

In January 1984, a computerized fuel tracking system was installed. The system, which Binkley helped select, required him to use the computer. Problems continued concerning Binkley's failure to complete his recordkeeping and filing duties.[1]

In early 1984, Binkley talked to the departmental safety officer about his concerns that dust in the garage and the use of portable heaters were creating hazardous conditions in the workplace. The safety officer investigated but

[1]Binkley blamed this on an excessive workload and dual duties required in working with the computer and performing clerk functions. Management, however, was of the opinion that Binkley was not using his time well because he was too easily distracted, and once off task, he did not expeditiously return to his duties.

thought that the dust was a nuisance rather than a problem. However, in response to employee complaints he arranged to have the dust tested.

In response to the backlog in Binkley's job, Kennedy set clear priorities on Binkley's duties, and in March instructed Binkley to report progress on certain tasks on a daily basis. Binkley objected to this daily oversight and felt that Kennedy was angry with him because he had gone over Kennedy's head in talking to the safety officer. Binkley complained to his union representative about the daily meetings, and after 2 weeks the meetings were stopped.

In mid–May, the safety officer received the results from the test described above which showed elevated levels of lead in the dust. In response, blood samples were taken from some of the workers to determine if they were developing lead poisoning, but the results of these tests, received in July, showed that the blood levels were within normal ranges.

In April or May, employees began discussing among themselves complaints they had against Kennedy. Eventually, they asked Binkley to prepare a complaint against Kennedy. After getting input from the employees, Binkley drafted a "Vote of No Confidence" setting out five charges.[2] The charges may be summarized as follows: (1) Kennedy did not timely respond to employee complaints about the dust and heating system problems, (2) Kennedy had not followed procedures in assigning a particular employee certain tasks, (3) Kennedy had failed to hire sufficient replacement mechanics which resulted in "normal vehicle maintenance functions" being "severely compromised", (4) Kennedy had been "less than honest and sincere" in dealing with his employees and had shown a "disdainful and disrespectful attitude" toward their input, (5) Kennedy had deceived the Department's Board of Directors about reorganizing the parts room so that he could get an air–conditioned office away from the dirty and

---

[2]The Vote of No Confidence is attached to this opinion as an appendix.

noisy garage. Although the document states that a majority of the employees support it, only Binkley signed it.[3] On June 1, 1984, Binkley sent the Vote of No Confidence to the Board of Directors of the Department of Public Utilities.

In response to his receipt of the Vote of No Confidence, Paul Nolan, one of the directors, sent a letter to Binkley indicating that he should have followed the usual procedures for complaints.[4] The document also prompted a meeting on June 4, 1984 between Nolan, Kennedy, Eric Herrmann (Kennedy's immediate superior) and other management officials regarding problems in the garage and progress toward reorganization. They determined that the charges in the Vote of No Confidence were without merit.

In addition, the issue of Binkley's efficiency was raised at this meeting. The previous problems with Binkley were known to management. Kennedy indicated that he was not satisfied with Binkley's job performance due to Binkley's inattention to duties and inability to stay on task. Various options regarding reassignment of Binkley were discussed. In light of the history of difficulties between Kennedy and Binkley, they decided that the best way to accomplish the reorganization of the garage was to reassign Binkley to the gatehouse outside the garage, where he would be away from Kennedy's area of responsibility. This decision was made by Eric Herrmann and was concurred in by all those present.

On June 6, Herrmann notified Binkley that he was reassigned to a clerk position with the building and maintenance section, which is also within the General Services Division. Although Binkley's wages and benefits remained the same, his duties did not. His principal duties were to record the numbers of all vehicles that entered and exited

---

[3]Two weeks later, however, 11 employees signed a second document which, *inter alia,* states support for the Vote of No Confidence. Some confusion, however, exists as to the exact intent of those employees signing the document.

[4]Binkley considered this letter to be a reprimand.

the garage, answer questions of those drivers who needed information, and perform assorted minor typing assignments and small projects. Following the reassignment, Kennedy was no longer Binkley's immediate supervisor; Jim Hood, who was the acting building maintenance supervisor, became Binkley's new immediate supervisor.

The reassignment upset Binkley, especially because he would no longer be able to work on the computer system, a part of his job that he had particularly enjoyed. He and other employees considered the reassignment to be in retaliation for drafting the Vote of No Confidence. Other employees considered the new job to be something of a joke. Moreover, Binkley felt that the reassignment was an attempt to demean him. Although Binkley requested to return to his old job, management refused.

In August 1984, Binkley filed a complaint with the Civil Service Board of the City of Tacoma. The Board ruled that it was prevented from hearing this complaint due to a damage claim that Binkley had filed against Tacoma. In addition, Binkley filed complaints with the State Department of Labor and Industries regarding alleged "toxic" dust and an alleged problem with the aerial man–lift inspection program.[5] On August 7, 1984, Binkley filed a claim against the City of Tacoma for $100,000 in damages resulting from management's "campaign of discrimination and harassment".[6]

Further problems developed. On September 25, 1984, Binkley refused to accept typing assignments out of a fear

---

[5]Binkley then filed complaints of discrimination alleging retaliation for making the safety complaints. In addition, he filed ethics complaints against the supervisors he deemed responsible for his reassignment. When the hearings examiner determined that there was no basis for an ethics complaint, Binkley promptly filed an ethics complaint against the hearing examiner. Binkley further complained about the safety of the typewriter he was assigned to use. Although Binkley attests to being an amateur litigator, his course of conduct in this dispute leaves little doubt as to his preferred method of dispute resolution.

[6]On November 26, 1984, Binkley filed an additional claim for damages in the amount of $900,000.

that he was being set up to be fired. Binkley maintained that it was difficult for him to type and record vehicle numbers simultaneously. He also felt that because he had been hired as a "clerk–nontypist" that he did not have to do any typing, even though he had voluntarily done so in his earlier position in the garage. Management's position was that nontypist clerks had to accept typing duties but were not expected to type at the speed of typist clerks. This was explained, both orally and by way of a written document, to Binkley in a meeting which his attorney attended. Nonetheless, Binkley continued to refuse to type. This led to a 5–day suspension, and subsequent refusals led to 10– and 30–day suspensions.[7] After receiving the third suspension, Binkley resigned on December 3, 1984, citing "intolerable conditions".

On October 24, 1984, before resigning, Binkley filed suit in Pierce County Superior Court against the City of Tacoma, the Department of Public Utilities, the Civil Service Board, and four Tacoma supervisors. The Civil Service Board and the supervisors were dismissed from the suit in separate summary judgment proceedings. On February 9, 1987, a jury trial commenced as to the municipal defendants. Two principal issues were submitted to the jury. First, was Binkley reassigned in violation of his constitutional right of free speech. Second, was Binkley constructively

---

[7]Binkley refused to initiate any administrative appeal or grievance procedure in response to the 5–day suspension. Although his union representative advised him to grieve the matter through the union, Binkley declined and the union representative secured a release. Following both the 5– and 10–day suspensions, Binkley returned to work and was advised that management had not changed its position in regard to the typing issue. Binkley was again notified of his option to use either the administrative or union grievance procedure, which he declined. Finally, noting the impasse, management offered to have the issue resolved by the Civil Service Board. Under this compromise, management agreed to waive its rights and be bound by the Board's recommendation. Binkley, however, refused the offer and continued to refuse all typing assignments. Accordingly, management decided to suspend Binkley for insubordination. He was suspended for 30 days because "the Civil Service Board will automatically review suspensions of over 22 work days". Binkley, however, notified management that he would not appeal the suspension to the Civil Service Board and submitted his resignation.

discharged because of the allegedly intolerable conditions of his new job. Binkley asked the jury to award damages of $310,600, including $50,600 for lost back pay and fringe benefits and the rest for emotional distress.

On February 27, 1987, the jury returned a $5,000 verdict in Binkley's favor on the retaliation claim but found that he had not been constructively discharged. Both parties moved for judgment notwithstanding the verdict, but both motions were denied. On June 29, 1987, judgment was entered on the verdict.

On July 17, 1987, the trial court awarded to Binkley, as the prevailing party, $16,416 in statutory attorney fees. On December 17, 1987, the trial court awarded him $370 in statutory costs of suit.

Both parties now challenge portions of these decisions. Tacoma contends that the trial court erred in finding the speech protected by the First Amendment, and seeks an order dismissing the discriminatory retaliation suit. Binkley seeks a new trial based on the admission of certain evidence at trial and requests that additional attorney fees and costs be awarded. These issues are addressed seriatim.

FREE SPEECH

 It is well settled that the government may not compel persons to relinquish their First Amendment right to comment on matters of public interest as a condition of public employment. *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968); *Perry v. Sindermann,* 408 U.S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972); *Keyishian v. Board of Regents,* 385 U.S. 589, 605–06, 17 L. Ed. 2d 629, 87 S. Ct. 675 (1967). In *Pickering,* the Supreme Court held that the First Amendment protects the rights of public employees "as citizens to comment on matters of public interest" in connection with the operation of the government agencies for which they work. *Pickering,* at 568. Nonetheless, the Court in *Pickering* observed that the government has legitimate interests in regulating the speech of its employees that differ significantly from its

interest in regulating the speech of people generally. *Pickering,* at 568.

The tension between a public employee's right to speak freely on matters of public concern and a public employer's interests in maintaining an efficient operation and avoiding disruptions in the workplace is not easily resolved. To determine if a public employer has violated a public employee's right to free speech, we employ a 4-step inquiry, each step of which must be satisfied. First, the public employee must establish that his speech dealt with a matter of public concern. *Connick v. Myers,* 461 U.S. 138, 147, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983); *Pickering,* at 568. Second, if the speech dealt with a matter of public concern, the public employee must prove that his interest in "commenting upon matters of public concern" is greater than the employer's interest in "promoting the efficiency of the public services it performs". *Pickering,* at 568. Third, the public employee must demonstrate that his speech was a substantial or motivating factor in the adverse employment decision of which he complains. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977); *Hayes v. Chicago,* 710 F. Supp. 239, 242 (N.D. Ill. 1989). Finally, if the public employee is able to prove these three elements, the burden shifts to the employer to prove that it would have reached the same decision even in the absence of the employee's protected conduct. *Mt. Healthy,* at 287. The first two inquiries are questions of law for the court to resolve. *Rankin v. McPherson,* 483 U.S. 378, 386 n.9, 97 L. Ed. 2d 315, 107 S. Ct. 2891 (1987); *Sweeney v. Athens Regional Med. Ctr.,* 705 F. Supp. 1556, 1567 (M.D. Ga. 1989); *Meyer v. UW,* 105 Wn.2d 847, 850, 719 P.2d 98 (1986). The latter two inquiries, however, are questions of fact ordinarily left to the jury. *Hall v. Ford,* 856 F.2d 255, 258 (D.C. Cir. 1988).

For purposes of this opinion, we will assume, without deciding, that the Vote of No Confidence constituted

speech on a matter of public concern.[8] Therefore, the next step is to determine if Binkley's interest, as a citizen, in commenting upon matters of public concern, outweighs the interest of Tacoma, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Rankin,* at 388; *Pickering,* at 568.

█ The magnitude of the employee's speech determines the extent to which the employer must justify his competing interest. *Connick,* at 150; *Dartland v. Metropolitan Dade Cy.,* 866 F.2d 1321, 1324 (11th Cir. 1989); *Roth v. Veteran's Admin.,* 856 F.2d 1401, 1407 (9th Cir. 1988). Where the employee's speech is a matter of public concern in only a limited sense, the employer's burden of justification is lighter. *Sweeney,* at 1570 n.9; *Zamboni v. Stamler,* 847 F.2d 73, 78 (3d Cir. 1988). The nature of Binkley's speech counsels us to conclude that the magnitude of his interest in speaking on a matter of public concern is slight.

We are presented with facts remarkably similar to those found in *Connick.* There, an assistant district attorney who had just been transferred out of her office circulated a survey to her former co–workers asking them questions about morale and the way in which the office was being run. The Supreme Court held that most of the survey involved personal rather than public concerns, with the exception of one question: Did other assistant district attorneys feel pressure to work on political campaigns for those who the office supported? The Court held that the survey "touched upon matters of public concern in only a most limited sense" (apparently because only one of the 14 questions involved a public concern) and that the "limited First Amendment

---

[8]In *Connick v. Myers,* 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983), the United States Supreme Court appears to have interpreted the public concern element broadly. There, the Court was satisfied that the plaintiff met the public concern test even though only one question in a 14–question survey constituted an issue of public concern. *Connick,* at 147–49. The Court seems to be saying that even the slightest tinge of public concern is sufficient to satisfy the first step of the *Pickering* test. However, since this is as yet unclear, we prefer to merely assume that the public concern test is met and resolve this case on the well settled principles in the balancing step.

interest involved here does not require that [the supervisor] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Connick,* at 154. The Supreme Court determined that a stronger showing of the employer's interest is necessary only "if the employee's speech more substantially involved matters of public concern." *Connick,* at 152.

Similar analysis is triggered by the present case. Viewed in its entirety, the Vote of No Confidence mainly involved employees' dissatisfaction with their supervisor. The Vote of No Confidence contains five separate charges, and charges two, four, and five unmistakably relate only to personal interests of the employees, inasmuch as they address work assignments, management style, and office locations. Even Binkley does not argue that these charges address public concerns. Moreover, in those instances in which the document arguably involves matters of public concern, that element of the speech is overshadowed by the personal interest nature of the speech, which permeates the document. The unequivocal design of the document is to deprecate the employees' supervisor. Consequently, because the Vote of No Confidence involved matters of public concern in only a most limited sense, we conclude that under the *Pickering* balancing test, Binkley's interest is slight.

Our inquiry does not end here, however. The employee's speech is not considered in a vacuum; rather, "the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin,* 483 U.S. at 388. This analysis, too, weighs against Binkley. The Vote of No Confidence arose in the context of a severely strained relationship between Binkley and his supervisor. Over the 10–month period preceding the Vote of No Confidence, Binkley and Kennedy had several disagreements and Binkley complained of Kennedy's management style. To this end, the Vote of No Confidence appears to be the perpetuation of Binkley's private interest in voicing his criticism of Kennedy. Moreover, because the Vote of No

Confidence is exclusively focused upon Binkley's supervisor rather than any governmental policy, the speech at issue is more in the form of a personal grievance.[9] We look at the *point* of Binkley's speech to determine whether he intended to raise an issue of public concern, or merely intended to further a personal interest. *Hayes,* 710 F. Supp. at 242. Was Binkley acting as an aggrieved employee, attempting to rectify problems in his own working environment, or was he acting as a concerned citizen bringing wrongdoing to light? *Connick,* at 147–48; *Roth,* at 1405; *Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir. 1985). Our conclusion is that the primary point of Binkley's speech was to further a personal interest.

In sum, the nature of Binkley's speech and the context, manner, and time in which it occurred lead us to conclude that the magnitude of Binkley's interest is small. Consequently, Tacoma's level of justification for Binkley's reassignment is light.

The governmental interest element of the *Pickering* balancing test "focuses on the effective functioning of the public employer's enterprise." *Rankin,* at 388. As the Supreme Court noted in *Rankin,* the government has a "strong state interest" in avoiding interference with work, personnel relationships, or disruptions in the public employer's function. *Rankin,* at 388. Moreover, in *Connick,* while applying the *Pickering* balancing test, the Supreme Court held that "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick,* at 151–52. The *Connick* Court further noted that it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick,* at 152.

---

[9]A statement is more likely to involve a public concern when it focuses on governmental policies and not on any particular person or supervisor. *See Meyer v. UW,* 105 Wn.2d 847, 851, 719 P.2d 98 (1986).

In the present case, we must determine if Tacoma reasonably believed that the Vote of No Confidence would interfere with the effective functioning of the Department of Public Utilities. Because both sides agree that a close working relationship is essential, Tacoma's decision to reassign Binkley following the Vote of No Confidence is afforded a wide degree of deference. In evaluating Tacoma's interest, we look to the context in which the dispute arose. *Connick*, at 153. The record indicates that the Division of General Services was in the process of trying to reorganize the garage and modernize its operations. Although considerable time and energy had been spent by Herrmann and Kennedy in attempting to work with Binkley and his problems, Binkley's actions and the method chosen by him in which to pursue his goals hindered the Department's reorganization and modernization. The Vote of No Confidence emerged after a persistent 10–month dispute between Binkley and Kennedy. Because the Vote of No Confidence emanates from an employment dispute between Binkley and his immediate supervisor, we afford additional weight to Tacoma's judgment that Binkley threatened the authority of his supervisor to effectively perform his duties.

The record indicates that the Vote of No Confidence interfered with work and personnel relationships. Charges two, four, and five in the Vote of No Confidence all reflected the extent to which Binkley was threatening his supervisor's authority. Although Binkley acknowledges that a close working relationship between the clerk and his supervisor was important to the proper functioning of the garage, Binkley's action directly challenged and undermined the authority of his supervisor, resulting in further deterioration of the working relationship. Moreover, considering that management believed the charges in the Vote of No Confidence to be falsely made, it is perplexing to see how Kennedy could have worked with Binkley after this episode. As was stated in *Connick*:

> [T]he Government, as an employer, must have wide discretion and control over the management of its personnel and

internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

*Connick,* at 151 (quoting *Arnett v. Kennedy,* 416 U.S. 134, 168, 40 L. Ed. 2d 15, 94 S. Ct. 1633 (1974) (Powell, J., concurring)). Considering the Vote of No Confidence in the context in which it occurred, Tacoma's decision to reassign Binkley appears to be appropriate.

Thus, the balance between the parties' respective interests weighs in favor of Tacoma. Binkley's interest in unrestrained exercise of his right of free speech is outweighed by Tacoma's strong interest in maintaining an efficient operation and in avoiding disruptions in the workplace. Accordingly, Tacoma's decision to reassign Binkley, following the Vote of No Confidence, is fully justified. Because Binkley has failed to satisfy the second step of our inquiry, there is no constitutional deprivation, and we have no need to consider the remaining steps.

Although we decide that the balance weighs in favor of the government employer, it must be made clear that today's decision does not abrade the First Amendment's protection of speech on appropriate matters of public concern. As noted earlier, we have presented the facts of this case in considerable detail to prevent any unwarranted extension of our holding. Simply stated, the First Amendment does not provide a disgruntled public employee a constitutional sword with which to strike out against an employer's carefully considered decision. Here, the City of Tacoma acted appropriately. Accordingly, we reverse that part of the trial court's decision holding Binkley's reassignment to be unconstitutional.

## CONSTRUCTIVE DISCHARGE

In addition to the free speech claim, Binkley raises two issues relating to his constructive discharge action. First, Binkley contends that the trial court erred in admitting

evidence which related to his failure to exhaust administrative remedies and in refusing his proposed jury instruction. Second, Binkley contends that the trial court should have awarded him back pay notwithstanding the jury's determination that he was not constructively discharged. We affirm the trial court on both of these issues.

When Binkley was disputing Tacoma's right to require him to type in the gatehouse and their right to suspend him for not doing so, he did not utilize procedures available to him through his union or the Civil Service Board. Binkley contends that the trial court committed error in admitting defense testimony of his failure to exhaust administrative procedures and in refusing to instruct the jury that exhaustion was not a prerequisite to bringing suit.

Binkley's argument misses the mark. Although he is correct in that exhaustion of remedies is not a prerequisite to bringing a section 1983 action in court, *Patsy v. Board of Regents,* 457 U.S. 496, 512–16, 73 L. Ed. 2d 172, 102 S. Ct. 2557 (1982), this evidence was clearly relevant to the separate issue of constructive discharge.

█ "Constructive discharge occurs where an employer deliberately makes an employee's working conditions intolerable thereby forcing the employee to resign." *Micone v. Steilacoom Civil Serv. Comm'n,* 44 Wn. App. 636, 643, 722 P.2d 1369, *review denied,* 107 Wn.2d 1010 (1986) (citing *Barrett v. Weyerhaeuser Co. Severance Pay Plan,* 40 Wn. App. 630, 631, 700 P.2d 338 (1985)). In this regard, courts must determine "whether a reasonable man would view the working conditions as intolerable". *Irving v. Dubuque Packing Co.,* 689 F.2d 170, 172 (10th Cir. 1982); *see Micone,* at 643.

As part of his constructive discharge argument at trial, Binkley contended that Tacoma's requirement that he type while performing other duties added to the intolerable circumstance of being transferred to a meaningless job. In response, Tacoma's position was that a reasonable man would have worked with the City to make the situation tolerable. The existence of grievance procedures through the

union and appeal procedures through the Civil Service Board are relevant to show that Binkley's employment situation was not necessarily so intolerable that he had to quit. It could be argued that a reasonable person would have attempted to take advantage of the other avenues of relief rather than quit. Accordingly, Binkley's failure to take advantage of administrative procedures was relevant to the issue of constructive discharge.

■ For similar reasons, the trial court also did not err in refusing to instruct the jury that "[t]he law does not require a Plaintiff to exhaust administrative or contractual remedies before bringing suit under 42 U.S.C. Section 1983." The only reason why such an instruction would have been appropriate would be to dispense with any misconception that a failure to exhaust remedies was fatal to Binkley's cause of action. However, there is no reason to think that the jury had any such misconception. The instructions that were given to the jury informed them of the applicable law and the various burdens of proof. Because exhaustion of remedies was not discussed in any of those instructions, any reasonable jury would have concluded that failing to exhaust remedies did not affect Binkley's case one way or the other, as indeed is the proper principle of law. A failure to instruct on an issue not relevant to the jury's deliberations is proper when there is no reason for the jury to be misled. *See State v. Rice,* 110 Wn.2d 577, 603, 757 P.2d 889 (1988) ("Jury instructions are sufficient if they permit each party to argue his theory of the case, are not misleading, and when read as a whole, properly inform the trier of fact of the applicable law."). We, therefore, conclude that the trial court did not err in refusing Binkley's proposed instruction.

■ In support of his contention that he was entitled to back pay notwithstanding the jury's determination that he was not constructively discharged, Binkley cites *Wells v. North Carolina Bd. of Alcoholic Control,* 714 F.2d 340 (4th Cir. 1983), in which the court *did* hold that back pay could be ordered even if no constructive discharge existed. *Wells,*

however, is distinguishable from the present case. In *Wells,* an employee was wrongfully denied a promotion on the basis of his race. The promotion would have carried with it a higher salary. The employee later resigned his job and argued that his employer had constructively discharged him. The appellate court held that back pay was properly awarded regardless of the outcome of the constructive discharge issue, and that the employee was entitled to recover the difference in pay between the job he should have been given and the job that he already had. This holding does little to help Binkley because his second job paid the same wage as his first. In the present case, back pay could have been awarded only if Binkley was constructively discharged.

Because Binkley's reassignment does not satisfy the test for demonstrating a constitutional deprivation of a public employee's right to free speech, the verdict against Tacoma is vacated and this case is remanded so that judgment can be entered in favor of Tacoma on the retaliation claim. Because Binkley is no longer the prevailing party under 42 U.S.C. § 1983, the award of attorney fees and costs is vacated. Furthermore, in regard to the constructive discharge claim, we affirm both the trial court's instruction regarding Binkley's failure to exhaust administrative remedies, and the trial court's determination that Binkley was not entitled to back pay.

APPENDIX

Utility Board June 1, 1984
City of Tacoma
Department of Public Utilities
P.O. Box 11007
Tacoma, WA 98411

Please Take Notice that a majority of the Fleet Services Section employees have expressed support for a Vote of No Confidence against W. Larry Kennedy, Utilities Fleet Manager, based upon the following charges:

## Charge One

That Mr. Kennedy has failed to respond in a timely and supportive manner to Health and Safety complaints from employees concerning the dust/ventilation problems and the lack of a heating system at the Fleet Services Garage. The Garage heating system worked intermittently during the Fall of 1983 and early Winter 1984, and since February has been totally inoperable.

## Charge Two

That Mr. Kennedy has abused the intent of the Interim Plan for Departmental Vehicular Procurement, item 4, concerning the duties of Engineering Aide, Claude Franklin. In addition to those duties specified in item 4 of the Interim Plan, Mr. Kennedy has had Mr. Franklin performing clerical, storekeeping, and supervisory duties and functions not specified in the Interim Plan.

## Charge Three

That Mr. Kennedy has failed to provide adequate new personnel to replace those employees who have left Fleet Services since August 1983. As a result, the normal vehicle maintenance functions and service call response of Fleet Services has been severely compromised.

## Charge Four

That Mr. Kennedy has been less than honest and sincere in his everyday contacts with Fleet Services personnel, and their Union representatives. Mr. Kennedy has also shown a disdainful and disrespectful attitude towards the suggestions, professional advice, and experienced input from Fleet Services personnel. His interfering management techniques and lack of good listening habits illustrate not only his obvious lack of Fleet Management experience but also his failure at being a good "people" manager.

## Charge Five

That Mr. Kennedy has deceived the Utility Board and others concerning the true purpose and effect of the recently approved Garage Parts Room construction project. Since Mr. Kennedy's employment in August 1983, he has refused to maintain his office in the traditional Utilities Garage location because of the high noise and dust problems. The Garage Office staff is structured around a team concept with the principal elements being the Shop Foreman, Storekeeper, and Garage Clerk. Each team member must interact with the other members in order to coordinate a timely response to incoming walk–in and phone–in service calls; parts and supplies procurement; the processing of purchase requisitions, invoices, and delivery tickets; and the ability to cover for those office staff members who might be absent due to sickness, vacation, or job functions which require their presence elsewhere in the Utility

Complex. The net effect of the new Parts Room Project, as presented by Mr. Kennedy, will be to break up the present team concept relationships by moving the Storekeeper and his Parts Room to another location in order to provide Mr. Kennedy with a new air–conditioned office at the location of the present Parts Room. As a result, the overall ability of the office staff to perform their interrelated job functions will be compromised.

### Conclusion

A number of Fleet Services personnel, over recent months, have repeatedly attempted to communicate to upper management various aspects of the situation involving Mr. Kennedy, only to find little or no positive and/or meaningful response. Hopefully, by this Vote of No Confidence, we can help encourage a speedy solution of the problems brought on by Mr. Kennedy and his management style. For further information, please contact the following Fleet Services employees' designated contact person:

> Kenneth L. Binkley
> P.O. Box 463
> Gig Harbor, WA 98335.
>
> Work Phone: 593–8241
> Home Phone: 272–5491

cc: Paul Nolan
 Ann Walton

CALLOW, C.J., UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, and SMITH, JJ., and MITCHELL, J. Pro Tem., concur.

Reconsideration denied May 17, 1990.