[No. 63500-5.   En Banc.]

Argued June 25, 1996.      Decided January 9, 1997.

JUDY C. WHITE, *Petitioner*, v. THE STATE OF WASHINGTON, ET AL., *Respondents*.

2

4

*Law Offices of Neil J. Hoff & Associates*, by *Paul A. Lindenmuth*, for petitioner.

*Christine O. Gregoire, Attorney General*, and *Jeffrey A. Freimund, Assistant*, for respondents.

*Jeffrey L. Needle* and *Clifford Freed* on behalf of Washington Employment Lawyers Association, amicus curiae.

GUY, J. — An employee of a state-operated nursing home brought this action alleging that she was transferred from one position to another in retaliation for reporting an incident of suspected patient abuse. The employee seeks damages, under the federal Civil Rights Act of 1871, 42 U.S.C. § 1983, for violation of her First Amendment rights and, additionally, asks this court to recognize an action in tort for "wrongful transfer in violation of public policy." We affirm the trial court's summary dismissal of the employee's action.

## FACTS

Judy White worked as a secretary/clerk typist at the

Washington State Soldiers' Home and Colony (Soldiers' Home or Home) in Orting from 1975 to 1992. The Soldiers' Home is a state-operated residence that provides nursing care services to indigent military veterans. Residents of the Soldiers' Home are voluntarily admitted and are free to leave whenever they choose.

The events that form the basis of White's lawsuit occurred in 1988, when White was working as a secretary for Evelyn Blanchard, the director of nursing services at the Soldiers' Home. From the time that Nurse Blanchard became the director of nursing services in 1984, the relationship between Blanchard and White had been strained. The relationship continually deteriorated. The record reflects mutual criticisms and distrust between the two from 1984 to late 1988.[1]

It was in this atmosphere of mistrust and quiet hostility that the events leading up to this lawsuit occurred.

During March and April 1988, one of the patients[2] at the Home became increasingly agitated. On April 11, 1988, the patient burned himself by placing lit cigarettes in his pockets. He began throwing lit cigarettes on the beds of other patients, was eating objects such as plastic pudding containers, scratching himself to the point of causing open sores, and smearing his feces on his arms and on the objects around him. The staff was unable to calm him. Minimal restraints were not successful. Medication was not effective. The staff members involved in the patient's treatment believed that the patient was a danger to himself and to others. Under Nurse Blanchard's direction, the patient ultimately was placed in a "posey jacket" or straightjacket to restrain him. The restraint jacket was in place for approximately two hours and was removed when the Home's medical director refused to sign an order permitting its use.

---

[1]The parties point to incidents of alleged misconduct, animosity and vindictiveness on the part of White and her supervisor occurring after 1988. However, these incidents are not a basis for the claims involved here and we do not consider them.

[2]Residents or patients at the Home are referred to by the staff as "members."

The Home's policy on use of restraints states in part:

> Body restraints may be used only upon a physician's written order. In case of emergency, restraints may be applied to prevent the member from harming himself, but a physician's written order must be obtained as soon as possible.

Clerk's Papers at 160.

White observed the patient while he was in the straightjacket. The use of restraints at the Home was rare, and White and other employees were upset that the patient had been placed in a straightjacket. The employees discussed the incident at a union meeting and White assumed that the employees who were directly involved in the incident would report it. When none of them did, White wrote a report on the incident of "patient abuse" and delivered it to the Home's medical director on May 4, 1988.[3] The medical director asked Alan Harrah, superintendent of the Home, to look into the matter.

The superintendent requested that a staff member from another soldiers' home investigate the alleged abuse. This investigation resulted in a report, dated June 7, 1988, which determined that "patient abuse" did not occur and that the "staff involved were acting in the best interest of the patient." Clerk's Papers at 82.

White learned the results of the investigation in mid-July 1988 and believed the investigation and report to be a "whitewash."

Beginning in December 1987—about five months before

---

[3]White's letter to the medical director states: "As chairperson of . . . local 53 . . . I have been bombarded with questions and comments regarding the use of a straight-jacket on . . . [a] nursing care member of the Home, on April 11, 1988. From discussion held at sub-local union meeting April 12th, I expected staff most directly involved to take action — i.e.: Write an incident report regarding member abuse/file a grievance. Neither has happened — to date (5/4/88); thus this inquiry and the attached incident report." Clerk's Papers at 356. The attached incident report stated: "Member . . . in straight-jacket, in wheelchair, was trying to get in phone booth (door was open) to make a phone call — others were pulling his chair away/out of phone booth, telling him he couldn't make call because he couldn't use his hands due to straight-jacket." Clerk's Papers at 357.

White complained of the suspected patient abuse—the Home's management had begun to discuss reorganization. Management determined that Nurse Blanchard was supervising too many departments and employees. When the physical plant at the Home became computerized to allow tracking the use and maintenance of machinery, management recognized that the plant manager would need a computer literate secretary to assist with the new duties. White was one of three secretaries employed at the Home, and the superintendent recommended to management that she be transferred to the plant manager's office. She was selected for transfer because her existing duties could readily be absorbed by remaining staff, and because she had the necessary computer skills and experience to perform the job at the plant. This transfer would not result in the loss of any benefits or salary and would not affect her employment classification. However, her transfer would mean that she was no longer working in the nursing services area. The Home's reorganization also would result in a transfer of two drivers and the entire nursing care custodial department to the physical plant.

White learned of the proposed transfer in August 1988 and, in September, she and her union representative met with the Home superintendent about the transfer. At this meeting the superintendent explained the transfer and the reasons for the transfer. White expressed her belief that the transfer was the result of her involvement in reporting the suspected patient abuse described above.

White's transfer was to be effective in November 1988. The transfer meant that White's office would be moved to the plant manager's former office in the physical plant. That office was remodeled with new carpets, cabinets and drapes. White considered the office an undesirable place to work and declined to participate in the remodeling project. She described the office as "a cinder block concrete dungeon with concrete floors and windows so high you could not even see out of them." She complained that the office was hot in the summer, had inadequate heat in the winter and was noisy.

White filed a union grievance complaining about the transfer. The grievance eventually went to mediation and was settled by agreement. The settlement agreement addressed White's concerns about the physical space in which she had to work but did not result in a transfer back to her original position.

In November 1991, White filed this action against the State of Washington and against Evelyn Blanchard and Alan Harrah, individually, alleging that White had been transferred in retaliation for reporting suspected patient abuse. She seeks damages for violation of her First Amendment rights under 42 U.S.C. § 1983 and for the tort of wrongful transfer in violation of public policy.

The trial court granted the State's[4] motion for summary judgment, dismissing all of White's claims. White appealed and the Court of Appeals affirmed the trial court's dismissal of White's wrongful transfer claim but reversed the trial court on the First Amendment claim and remanded for trial. *White v. State*, 78 Wn. App. 824, 898 P.2d 331 (1995), *review granted*, 128 Wn.2d 1024 (1996). White petitioned for review of the ruling on the wrongful transfer issue and the State petitioned for review of the First Amendment issue. This court granted both petitions for review.

## ISSUES

1. Did the plaintiff-employee present a prima facie case of retaliation in violation of her First Amendment right to freedom of speech sufficient to withstand a motion for summary judgment?

2. Should the court create a cause of action in tort for wrongful transfer in violation of public policy?

## DISCUSSION

■ In reviewing a grant of summary judgment, an ap-

---

[4]For convenience, the defendants are referred to collectively herein as the State.

pellate court engages in the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). A summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990).

The court should consider the evidence and the reasonable inferences therefrom in a light most favorable to the nonmoving party. *Schaaf v. Highfield*, 127 Wn.2d 17, 21, 896 P.2d 665 (1995). However, a nonmoving party may not rely on speculation or on argumentative assertions that unresolved factual issues remain. After the moving party submits adequate affidavits, the nonmoving party must set forth specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a genuine issue as to a material fact. *Meyer v. University of Wash.*, 105 Wn.2d 847, 852, 719 P.2d 98 (1986). Where reasonable minds could reach but one conclusion from the admissible facts in evidence, summary judgment should be granted. *LaMon v. Butler*, 112 Wn.2d 193, 199, 770 P.2d 1027, *cert. denied*, 493 U.S. 814 (1989). Summary judgment motions are important to the process of resolving disputes.

## First Amendment Claim

The State moved for summary dismissal of White's § 1983 First Amendment claim on the ground that White was unable to present a prima facie case on this claim.

The federal Civil Rights Act of 1871, 42 U.S.C. § 1983, provides a cause of action for damages against any person who, under color of law, subjects another to the deprivation of any right guaranteed under the Constitution. In this case, White alleges deprivation of her right to freedom of speech guaranteed under the First Amendment to the federal Constitution.

10

Early cases held there was no First Amendment free speech right on the part of public employees. Public employment was considered a privilege that could be conditioned or denied. *See, e.g., McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 220, 29 N.E. 517 (1892) (where Holmes, J., observed that the "petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman").

Today it is clearly established that a State may not discharge or otherwise discipline an employee on a basis that infringes upon that employee's constitutionally protected interest in freedom of speech. *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987) (discharge); *Binkley v. City of Tacoma*, 114 Wn.2d 373, 381, 787 P.2d 1366 (1990) (job reassignment); *Meyer*, 105 Wn.2d at 850-51 (letter of reprimand); *Edwards v. Department of Transp.*, 66 Wn. App. 552, 558, 832 P.2d 1332 (1992) (disciplinary action).

■■ The employee's right to speak out is not absolute, however. To be protected under the First Amendment, the employee's speech must involve a matter of public concern. Additionally, the interest of the employee in expressing himself or herself must outweigh the interest of the State in efficiently providing the public services it performs through its employees. *Waters v. Churchill*, 511 U.S. 661, 114 S. Ct. 1878, 1884, 128 L. Ed. 2d 686 (1994); *Connick v. Myers,* 461 U.S. 138, 142, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).

In order to present a prima facie case of retaliation in employment based on the exercise of First Amendment rights, the public employee must demonstrate that (1) the speech involved is protected by the First Amendment, and (2) the speech was a substantial or a motivating factor in the adverse employment decision. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977); *Bernheim v. Litt*, 79 F.3d 318, 324 (2d Cir. 1996). *See also Binkley*, 114 Wn.2d at 382

(dividing these into three steps). If the employee meets this burden, then the burden shifts to the employer to prove that it would have made the same adverse employment decision even in the absence of the employee's protected conduct. *Mt. Healthy*, 429 U.S. at 287; *Binkley*, 114 Wn.2d at 382.

Thus, the first inquiry before the court is whether the speech involved is protected by the First Amendment. This is a question of law. *Binkley*, 114 Wn.2d at 382. Two steps are involved in the court's determination of this issue: (1) the court decides the threshold issue whether the speech involved may be fairly characterized as constituting speech on a matter of public concern, and, if so, (2) the court decides whether the employee's interest in exercising his or her right to freedom of speech is greater than the interest of the government in promoting efficiency in the public service it performs. *Waters*, 114 S. Ct. at 1884; *Rankin*, 483 U.S. at 384-85.

The trial court in the present case ruled that, in light of the circumstances, employee White's report of suspected patient abuse was not a comment on a matter of public concern but was instead a critical comment about another employee's actions. The Court of Appeals reversed, holding the content of the speech—suspected abuse of a nursing home patient—was a matter of public concern and that "a topic otherwise of public concern does not lose its importance merely because it arises in the context of an employment dispute." *White*, 78 Wn. App. at 834.

Whether an employee's speech addresses a matter of public concern is determined by the content, form and context of the statement, as revealed by the whole record. *Connick*, 461 U.S. at 147-48. Content is the most important factor. *See, e.g., Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1501 (7th Cir. 1994).

The content of White's speech—suspected abuse of a nursing home patient—involves an issue of public concern. The public concern over proper care of vulnerable nursing home patients is reflected in RCW 70.124, a statute which

requires nursing home employees to report alleged abuse or mistreatment of nursing home patients. *See also Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 593 (10th Cir. 1994) (reports of nursing home patient abuse are matters of public concern); *Lenzer v. Flaherty*, 106 N.C. App. 496, 418 S.E.2d 276, 283 (1992) (patient abuse in any form in government-operated hospital is a matter of public concern). The fact that an investigation finds the report of suspected abuse to be without merit does not affect the importance of the content to the public. *See Binkley*, 114 Wn.2d at 378.[5]

The State argues that even though suspected patient abuse in a state-operated nursing home may be a matter of public concern, the report here is not protected by the First Amendment because of the context within which it was made. If the public employee speaks not as a citizen about a matter of public concern but instead as an employee upon a matter of personal interest, the court is generally not the appropriate forum for reviewing the wisdom of a personnel decision taken by the public employer in response to the employee's speech or behavior. *Connick*, 461 U.S. at 147.

The State points to the history of animosity between White and Nurse Blanchard and argues that White was acting as an employee involved in a dispute with her supervisor, not as a citizen reporting a matter of public concern.

The record shows that White and Blanchard did not get along and that White criticized Blanchard on a number of

---

[5]This court in *Binkley v. City of Tacoma*, 114 Wn.2d 373, 382, 787 P.2d 1366 (1990) assumed, without deciding, that the employee's speech in that case constituted speech on a matter of public concern. The speech involved there was a written Vote of No Confidence in Binkley's supervisor. One of the five charges in the statement dealt with deception and unauthorized use of government property. The charges were investigated and found to be without merit. *Binkley* noted that *Connick v. Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) interpreted the public concern element broadly, saying "The Court seems to be saying that even the slightest tinge of public concern is sufficient to satisfy the first step of the *Pickering [v. Board of Educ.*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)]* test." *Binkley*, 114 Wn.2d at 383 n.8.

occasions. The record also shows that White was a good employee and that her actions with respect to the patient involved in this incident were supported by the patient's family and other staff members. The fact that White may have had a personal interest in reporting the incident does not diminish the concern the public would have in this matter.

Based on the nature of the speech involved in this case, we hold that the speech involved a matter of public concern.

To fall within the scope of the First Amendment protections, the employee's interest in speaking on this matter also must be greater than the employer's interest in limiting that speech. *Rankin,* 483 U.S. at 384.

The United States Supreme Court has been careful to avoid fashioning a bright-line rule establishing what constitutes protected speech in public employee First Amendment cases. *See, e.g., Pickering,* 391 U.S. at 569. In place of a general standard, the Supreme Court has held that in determining whether speech of a public employee is a constitutionally protected expression in any particular case, the court must balance the interests of the public employee, as a citizen, in commenting upon matters of public concern, against the interest of the State, as an employer, in promoting efficiency of the public services it performs. *Mt. Healthy,* 429 U.S. at 284; *Pickering,* 391 U.S. at 568; *Binkley,* 114 Wn.2d at 382.

██ ██ The nature of the balancing analysis required under *Pickering* and *Binkley* and the various ways of explaining the necessary analysis appear to have created some confusion with respect to which party has the "burden of proving" that the employee's interest in commenting upon the matter of public concern is greater than the employer's interest in promoting the efficiency of the public service it performs. *White,* 78 Wn. App. at 835. Many cases state that the employee has the burden of showing that his conduct was protected by the First Amendment. *Bernheim,* 79 F.3d at 324; *Johnson v. Mult-*

*nomah County*, 48 F.3d 420, 422 (9th Cir.), *cert. denied*, 115 S. Ct. 2616 (1995); *Moore v. City of Wynnewood*, 57 F.3d 924, 931 (10th Cir. 1995).

Although the *employee* has the burden of showing that the speech is on a matter of public concern, courts generally then go on to require the *employer* to demonstrate that the discharge or other disciplinary act was justified because of the employer's need to promote efficiency in the workplace. *Binkley*, 114 Wn.2d at 383. *See also Rankin*, 483 U.S. at 388; *Connick*, 461 U.S. at 149. The Supreme Court does not discuss the test in terms of burdens of proof but rather says that "it is the *court's* task" to balance the interests of the employee against the interests of the employer and to determine, as a matter of law, which of those interests is greater. *Waters*, 114 S. Ct. at 1884 (emphasis added); *Connick*, 461 U.S. at 142; *Pickering*, 391 U.S. at 568; *Rankin*, 483 U.S. at 385-86.

While the language of the law defining the allocation and extent of the parties' burdens in demonstrating the competing interests involved is somewhat ambivalent, the framework for deciding First Amendment cases in the public employment setting is clear. The respective burdens of the parties fall naturally, within this framework, upon the party who seeks to justify his or her actions in light of First Amendment rights and restrictions.

In the present case, the employer does not admit that it took any action to punish White for reporting the alleged patient abuse. The State's position is that the transfer of White to another department in the Home was (1) not an adverse action, and (2) was discussed and tentatively decided before the straightjacket incident and White's reporting of the incident. For purposes of performing the balancing test in this case, the court must assume that the State's transfer of White was connected to her report of suspected patient abuse. We make this assumption only for the purpose of the second step of our analysis. If her speech is determined to be protected by the First Amendment, White would still have the burden of proving that

the State transferred her in retaliation for exercising her right to speak out about the suspected patient abuse.

The government has a legitimate interest in promoting efficiency and integrity in the discharge of its official duties and to maintain proper discipline. As an employer, the government must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation. *Connick*, 461 U.S. at 150-51. Government agencies are charged by law with doing particular tasks. When someone who is paid a salary to contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain the employee. *Waters*, 114 S. Ct. at 1887-88.

In order to balance the interests of the parties, the court must be presented with evidence of the State's interests. It is at this point in the First Amendment analysis that the government employer has the burden of presenting evidence to show that it was justified in restricting the employee's right to freedom of speech. *Connick*, 461 U.S. at 152; *Binkley*, 114 Wn.2d at 383. The more important the employee's speech is to the public, the stronger the showing that must be made on the part of the employer. *Binkley*, 114 Wn.2d at 384.

Relevant factors which may be considered in the balancing analysis include (1) the time, place and manner of the employee's speech, *Connick*, 461 U.S. at 153; (2) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (3) whether the employment relationship is one in which personal loyalty and confidence are necessary; and (4) whether the speech impeded the employee's ability to perform daily responsibilities. *Wright*, 40 F.3d at 1502.

Actual disruption need not be shown and deference is given to government predictions of harm. *Waters*, 114 S. Ct. at 1887; *Meyer*, 105 Wn.2d at 851.

Here the State's evidence to justify the transfer is unrelated to White's speech. The State's position is that it transferred White as part of a reorganization of the Home. The State's argument and evidence in this regard are more properly considered under the final step of the *Binkley* test, i.e., whether the transfer would have occurred even without the exercise of First Amendment rights.

However, even if the State were able to show that White's report of suspected patient abuse had disrupted the efficiency of the nursing home operation, had further adversely affected the working relationship between White and her supervisor, and had created disharmony among co-workers, it would be difficult to find that those interests outweigh the interest of a nursing home employee in reporting suspected abuse of a patient. Such a finding would be contrary to the public policy of the state as reflected in RCW 70.124 (abuse of nursing home patients).

■ The interest of an employee of a nursing home in reporting suspected patient mistreatment or abuse outweighs the State's interest in operating its nursing home without the disruption that may result from a report of suspected abuse of a patient. We hold the speech at issue in this case—reporting suspected patient abuse—is protected under the First Amendment.

The employee next has the burden of proving that the protected speech was a substantial or motivating factor in the adverse employment action. *Binkley*, 114 Wn.2d at 382; *Mt. Healthy*, 429 U.S. at 285; *Edwards*, 66 Wn. App. at 563.

This issue generally presents a question of fact. *Binkley*, 114 Wn.2d at 382. Because this case was decided on the State's motion for summary judgment, we consider the evidence and reasonable inferences therefrom in a light most favorable to employee White. *Schaaf*, 127 Wn.2d at 21. If reasonable minds could reach but one conclusion based on the facts in evidence, summary judgment should be granted. *LaMon*, 112 Wn.2d at 199. However, if a dispute as to the facts remains, the motion should be denied. CR

56(c). White, the nonmoving party here, may not rely on speculation and must produce sufficient evidence to create a genuine issue of fact to support her contention that her report of suspected patient abuse was a substantial or motivating factor in her transfer to the physical plant. *Jordan v. City of Oakville*, 106 Wn.2d 122, 133, 720 P.2d 824 (1986). After the moving party submits affidavits in support of its motion, the nonmoving party must set forth specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a genuine issue as to a material fact. *Meyer*, 105 Wn.2d at 852.

The State presented evidence that the transfer was part of a plan to reorganize the operation of the Soldiers' Home and that White was determined to be the best person to fill the position of plant manager's secretary. The State's evidence is that it began formulating the reorganization and began discussing the transfer of White several months before the incident that was the basis of the report of suspected abuse. White's evidence is speculative, and White essentially asks the court to infer from the timing of the transfer that the change was made in retaliation for the report. She also argues that other employees could have been selected for transfer.

Viewing the evidence in a light most favorable to White, we find White's evidence is insufficient to create a genuine issue of fact supporting her contention. *Jordan*, 106 Wn.2d at 131 (the plaintiff failed to show that the city council's decision to reduce the size of the police force and eliminate plaintiff's job was based on anything other than budgetary concerns); *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1368 (7th Cir. 1993) (the mere fact that protected speech precedes an employment decision does not create the inference that the decision was motivated by the speech); *Nelson v. Pima Community College*, 83 F.3d 1075 (9th Cir. 1996) (the existence of a mere scintilla of evidence is not enough to create a genuine issue of fact).

White did not present sufficient evidence to support a prima facie case of retaliatory action on the part of the

State, and her § 1983 claim was appropriately dismissed on summary judgment.

## Wrongful Transfer

White asks this court to recognize a cause of action in tort for wrongful transfer in the public employment setting. She proposes that this new tort be based on the same rationale relied on by this court in developing the tort of wrongful discharge in violation of public policy.

The tort of wrongful discharge was created as an exception to the general rule that unless an employee has a contract for a definite term of employment, the employee may be discharged at any time without cause and without recourse. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984); *Roberts v. ARCO*, 88 Wn.2d 887, 894, 568 P.2d 764 (1977). The general rule permitted employees to be discharged unfairly in violation of public policy in some cases. To avoid sanctioning such a discharge, we created a cause of action in tort for wrongful discharge of an employee where there is a violation of a clear mandate of public policy. *Thompson*, 102 Wn.2d at 233.

In *Thompson* this court created a *narrow* exception to the employment-at-will doctrine. We declined to adopt a broad "bad faith" exception to the employment-at-will rule which would have implied a covenant of good faith and fair dealing in every employment contract. *Thompson*, 102 Wn.2d at 227. We found that the "bad faith" exception would be too great an intrusion into the employment relationship. *Thompson*, 102 Wn.2d at 228. We were careful to balance the importance of allowing private employers the right to operate their businesses against the importance of prohibiting wrongful actions against employees. *Thompson*, 102 Wn.2d at 232.

We have not yet considered whether an employee should be able to recover for disciplinary actions that do not result in discharge where the employer's actions violate a clear mandate of public policy. Other jurisdic-

tions which have considered the issue are divided with respect to whether an employee has a cause of action, based on public policy, for disciplinary actions. No jurisdiction appears to have considered extending a public policy cause of action to a lateral job transfer which does not result in a loss of pay, rank, job classification or benefits. *See, e.g., Zimmerman v. Buchheit of Sparta, Inc.,* 164 Ill. 2d 29, 645 N.E.2d 877 (1994) (refusing to extend the tort of wrongful discharge to include demotions); *Ludwig v. C & A Wallcoverings, Inc.,* 960 F.2d 40 (7th Cir. 1992) (employee cannot bring a wrongful discharge claim for retaliatory discharge when she was merely demoted); *Mintz v. Bell Atlantic Sys. Leasing Int'l, Inc.,* 183 Ariz. 550, 905 P.2d 559 (1995) (a public policy tort for failure to promote does not exist and it is unnecessary for courts to create one); *Foley v. Interactive Data Corp.,* 47 Cal. 3d 654, 254 Cal. Rptr. 211, 765 P.2d 373 (1988) (expansion of tort remedies in employment actions has potential for enormous consequence in the stability of the business community); *Scott v. Pacific Gas & Elec. Co.,* 11 Cal. 4th 454, 46 Cal. Rptr. 2d 427, 904 P.2d 834 (1995) (court upheld employee's wrongful discharge claim because of an implied contractual agreement with employer not to demote without good cause); *Garcia v. Rockwell Int'l Corp.,* 187 Cal. App. 3d 1556, 232 Cal. Rptr. 490 (1986) (employee successfully brought wrongful discharge action when employer suspended him without pay as a retaliatory measure).

Generally, other jurisdictions share the same concern as the Court of Appeals in this case, that recognizing a cause of action for wrongful disciplinary action less than discharge has the potential to expand and to generate frivolous claims. *Ludwig,* 960 F.2d at 43; *Mintz,* 905 P.2d at 562; *White,* 78 Wn. App. at 839. In *White,* the Court of Appeals reasoned that by recognizing a cause of action for employer actions short of an actual discharge, the court would be opening a floodgate to frivolous litigation and substantially interfering with an employer's discretion to make personnel decisions. *White,* 78 Wn. App. at 839-40. The Court of Appeals noted that "the courts are ill-

equipped to act as super personnel agencies." *White*, 78 Wn. App. at 840 (citing *Washington Fed'n of State Employees v. State Personnel Bd.*, 29 Wn. App. 818, 820, 630 P.2d 951 (1981)). We agree with the reasoning and the decision of the Court of Appeals.

Subjecting each disciplinary decision of an employer to the scrutiny of the judiciary would not strike the proper balance between the employer's right to run his business as he sees fit and the employee's right to job security. *See Thompson*, 102 Wn.2d at 227. This is particularly true in instances like this one where an employee's rights are already protected by civil service rule, by a collective bargaining agreement, and by civil rights statutes.

Because we hold that the civil rights claim was properly dismissed, we do not reach the State's issue on qualified immunity.

## CONCLUSION

Although White's speech was protected under the First Amendment, White did not show a causal link between the speech and the lateral transfer in her employment and therefore failed to present a prima facie case sufficient to withstand a motion for summary judgment. We decline White's invitation to create a tort for wrongful transfer.

The Court of Appeals decision with respect to the First Amendment claim is reversed; the Court of Appeals is affirmed with respect to the tort of wrongful transfer.

DURHAM, C.J., and DOLLIVER, SMITH, ALEXANDER, TALMADGE, and SANDERS, JJ., concur.

MADSEN, J. (concurrence) — Although I concur in the result reached by the majority, I write separately because the majority fails to offer any principled reason for refusing to recognize a tort cause of action for retaliatory transfer in violation of public policy. To the contrary, the policy underpinnings of the wrongful discharge tort apply

equally well to retaliatory actions short of discharge, and support recognition of such a cause of action. In addition, while I agree generally with the majority's analysis of the First Amendment issue, I believe the court should expressly acknowledge that First Amendment protection should not apply where an employee knowingly and falsely reports allegations of employer misconduct for personal reasons.

When this court recognized a cause of action for discharge in violation of public policy, it did so based upon its concern that the terminable-at-will doctrine not be used to shield an employer's action which otherwise frustrates a clear mandate of public policy. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 231, 685 P.2d 1081 (1984). This exception to the terminable-at-will rule is a narrow one which, while protecting employee job security against employer actions contravening public policy, at the same time recognizes the need to protect against frivolous lawsuits and allow employers to make personnel decisions without fear of civil liability. *Thompson*, 102 Wn.2d at 232-33; *Farnam v. CRISTA Ministries*, 116 Wn.2d 659, 668, 807 P.2d 830 (1991). Thus, when identifying a clear public policy basis for a wrongful discharge tort cause of action, the court undertakes a careful analysis to meet the goal of allowing a cause of action only in the most worthy circumstances, and implicitly, if not explicitly, recognizes that the risk of frivolous suits is insufficient ground to preclude the cause of action.

Five years after recognizing the wrongful discharge tort in *Thompson*, this court "firmly grasp[ed] the doctrine of constructive discharge as a means to protect against employment discrimination." *Bulaich v. AT & T Info. Sys.*, 113 Wn.2d 254, 259, 778 P.2d 1031 (1989). In doing so, the unanimous court said that "insidious acts are able to erode the Legislature's laudable goals just as effectively, and perhaps in a more demoralizing fashion, than a direct termination would otherwise accomplish." *Id.* at 259. *Bulaich* did not involve a *Thompson* violation of public policy

claim; rather, it involved a claim of discrimination under RCW 49.60.180. Nevertheless, the court quite clearly, and wisely, concluded that outright termination is not the only way in which an employer's conduct can thwart public policy—there, public policy embodied in RCW 49.60.

The same is true of violations of public policy cognizable under *Thompson* and its progeny. The employer's wrongful action is wrongful and violative of public policy whether it is a wrongful discharge or a wrongful demotion, suspension without pay, or similar disciplinary action short of discharge. The only difference is the nature and extent of the damage suffered by the employee. *Garcia v. Rockwell Int'l Corp.*, 187 Cal. App. 3d 1556, 232 Cal. Rptr. 490, 493 (1986) (recognizing tort action for retaliatory suspension without pay for employee's whistleblowing activities). Moreover, if the court agrees that public policy demands protection of the employee and allows a wrongful discharge action, then it follows that the risk of frivolous suits is an insufficient ground to preclude the cause of action for disciplinary action less than discharge. Accordingly, the majority's fear of frivolous claims is fundamentally at odds with the recognition of the wrongful discharge tort—if the identified public policy is so important that the wrongful discharge claim should be allowed, then it is important enough to support a claim based upon lesser "insidious acts" of an employer which may just as effectively contravene a clear mandate of public policy.

Further, insofar as the wrongful discharge tort action sanctions employer conduct which frustrates a clear mandate of public policy, it has a deterrent effect on wrongful employer conduct. Under the majority's holding, however, an employer is invited to avoid potential civil liability merely by engaging in some disciplinary action other than discharge.

The majority's recitation that courts are ill-equipped to act as super personnel agencies misses the mark. In a given case, the question will be whether the employer has

engaged in disciplinary conduct violative of public policy. Courts routinely examine similar questions in a wide variety of cases, and, in particular, courts in this state routinely address issues of workplace discrimination involving employer action other than unlawful discharge.

The majority's fear of opening the "floodgates" merits little response. That argument can be made in virtually any case where it is proposed that a cause of action be recognized or extended, or where the Legislature considers legislation recognizing a new cause of action. The same argument, if accepted, would have prevented recognition of the wrongful discharge tort in the first place.

For all these reasons I am unable to agree with the majority's absolute rejection of a cause of action for wrongful transfer in violation of public policy.[6] However, I must agree that, in this case, Ms. White is not entitled to pursue such a cause of action. She has identified a strong public policy in reporting suspected patient abuse, one which may serve as the foundation of a First Amendment claim, and one which the Oregon Court of Appeals has recognized as supporting a wrongful discharge tort claim. *Hirsovescu v. Shangri-La Corp.*, 113 Or. App. 145, 831 P.2d 73 (1992); *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or. App. 107, 684 P.2d 21, *review denied*, 688 P.2d 845 (1984). However, the majority correctly concludes, in addressing White's First Amendment claim, that she has failed to present sufficient evidence that her transfer occurred as a result of her reporting suspected patient abuse. Accordingly, she is also unable to show that her transfer was motivated by reasons contravening a clear mandate of public policy.

There is also a serious issue about whether a civil ser-

---

[6]It bears repeating that the first inquiry in a case where a claim is premised on employer action short of discharge is to determine whether there is a clear mandate of public policy which would justify a *Thompson* wrongful discharge claim, had the employee been discharged. The framework for that analysis was set up in *Thompson*. Only if there is such a clear mandate of public policy should the cause of action be available to redress either termination or disciplinary actions short of outright termination. *See Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 951, 913 P.2d 377 (1996) (Madsen, J., dissenting).

vant such as Ms. White is entitled to pursue a public policy tort claim. The *Thompson* line of cases serves as an exception to the terminable-at-will doctrine, and nonexempt civil servants' employment is covered by a number of statutory provisions. *See, e.g., Tomlinson v. Board of Educ.*, 629 A.2d 333, 347 n.18 (Conn. 1993) (wrongful discharge tort claims fail where teacher, a tenured employee of the state, is not an employee at will). Whether or not civil servants are entitled to such a cause of action, however, the majority's holding is too broad because it denies the cause of action to all employees.

Turning briefly to the majority's analysis of White's First Amendment claim, I have to say initially that there is considerable evidence that White has cloaked a personal vendetta in First Amendment raiment. Nevertheless, the majority exercises sound judicial restraint upon this review of summary judgment and correctly concludes that a report of suspected patient abuse is speech of public concern. The majority further concludes that the State[7] failed in this case to show any interests justifying restricting White's right to freedom of speech. The State simply insisted the transfer was not a result of White's report of suspected patient abuse. In the course of its analysis, the majority states that the fact that White's report of suspected patient abuse was found to be without merit does not affect the importance of the content of her speech to the public, and states that the fact that White may have had a personal interest in reporting the abuse does not diminish the public's concern. Majority at 12. Both of these statements are true as general propositions. I would add, however, that merely because allegations of patient abuse are made, an employee is not necessarily protected under the Constitution from disciplinary action for reporting possible patient abuse. There is a considerable body of law dealing with recklessly or knowingly false statements made by disciplined employees who pursue a constitutional

---

[7]I follow the convention used by the majority and refer to all the defendants collectively as the State.

tort claim founded on the First Amendment. *See generally, e.g.,* Howard C. Nielson, Jr., Comment, *Recklessly False Statements in the Public-Employment Context,* 63 U. CHI. L. REV. 1277 (1996) (and cases cited therein). While in this case there may have been a basis in fact for White's report of suspected patient abuse,[8] in my view, First Amendment protection should, at the least, be unavailable in the case of the knowingly false allegation made for personal reasons

I concur in the result reached by the majority.

JOHNSON, J., concurs with MADSEN, J.

Reconsideration denied February 20, 1997.

[8] I give the benefit of the doubt to Ms. White, who reported patient abuse despite a written policy permitting in emergency situations the bodily restraint of patients for brief periods pending physician review, in order to prevent the patient from harming himself. The patient in this case was restrained for two hours and the straightjacket was removed when the nursing home director refused to sign an order permitting its use.