[No. 42106-9-I. Division One. March 1, 1999.]

LEANNE GROSS PULCINO, *Appellant*, v. FEDERAL EXPRESS CORPORATION, *Respondent*.

---

*Ellen M. Ryan*, for appellant.

*Philip S. Morse* of *Perkins Coie* (*John B. Austin* and *Rose Jagust* of *Kaplan Begy & Von Ohlen*; and *Colby S. Morgan, Jr.*, of *Federal Express Corp.*, of counsel), for respondent.

Agid, J. — Leanne Gross Pulcino, a former Federal Express (FedEx) flight attendant, sued FedEx alleging unlawful discrimination based on injuries she sustained while working as a FedEx handler and on her union affiliation. Pulcino appeals the trial court's order dismissing her disability discrimination claim and limiting her union discrimination claim to wrongful discharge. Because Pulcino was not disabled as defined by law, the trial court properly dismissed the disability discrimination claim. But we agree with Pulcino that RCW 49.32.020 gives her a cause of action against FedEx for wrongful interference with organized workers, and the court erroneously limited her union discrimination theory to wrongful discharge. Accordingly, we reinstate the union discrimination claim and remand for further proceedings.

## FACTS

Leanne Gross Pulcino was a flight attendant (FA) with Flying Tigers, a charter airline that transports military personnel, from May 1981 until FedEx purchased Flying Tigers in 1989. FedEx, which had been nonunion since its founding in 1973, acquired more than 10 collective bargaining units with this purchase. By 1992, however, only the FA unit remained. On April 13, 1992, FedEx informed the FAs that due to military downsizing, it had decided to discontinue its military passenger service and lay off 250 FAs.[1] The letter assured the FAs that FedEx was "presently meeting with [their] collective bargaining representatives regarding these issues."

After the layoff, FedEx CEO Frederick Smith sent a letter to the FAs, explaining that "the terms and conditions of employment for the flight attendants are established as a result of negotiations with their collective bargaining rep-

---

[1] Pulcino asserts that FedEx made this decision because an effort to decertify the FA's union had failed a week earlier.

resentative." The letter continued, stating Smith claimed that the recently-concluded negotiations between FedEx and the Teamsters, the FA's representative, gave the FAs access to two personnel representatives to assist them in their job search,[2] and that "flight attendants will be considered equally with external candidates for any position at Federal Express for which they are qualified." FedEx was unable to identify any contract provision or negotiation document which directs that FAs were to be treated as external candidates after the layoff. An August 7 e-mail from a FedEx supervisor clarified that this "external" labeling meant that the FAs could not transfer or bid into internal FedEx jobs through career opportunity postings.

After Pulcino learned of the layoff, she tried to reach one of the assigned personnel representatives, Jan Edwards, but because of Edwards' continued unavailability, Pulcino did not contact her until a few weeks before the scheduled furlough.[3] In response to Pulcino's request for a courier job within commuting distance, Edwards indicated that the Bothell station had an opening, but that she did not know what the position was. Pulcino contacted Bothell's station manager, who told her he had only a part-time handler position open.[4] Pulcino accepted the position, understanding that she would transfer to a courier job when one became available. As a handler, Pulcino was required to stack items onto pallets, shrink-wrap and maneuver the stacks onto pallet jacks, and push the pallets into trucks at the Microsoft dock.[5] She claims after she started work, FedEx

---

[2]Pulcino claims that these representatives were "used to keep track of the unionized FAs and funnel them into the worst jobs at FedEx."

[3]This fact and the following facts about Pulcino's experiences after being laid off are derived primarily from Pulcino's summary judgment declaration and hearing testimony because we take the facts in the light most favorable to her at this juncture.

[4]Pulcino claims that this is not true and a courier position was open in Bothell. Her manager testified that Pulcino became a handler because "the information we got was that she was supposed to have been placed in a handler position."

[5]Pulcino asserts that this was an "unusually heavy" type of handler job, and

withheld her paychecks for several weeks and would not provide her with benefit information.

Pulcino had several meetings with management to determine why she had not been receiving paychecks and why they had not given her a courier position. During one of those meetings, she saw that her manager, Marques Bailey, had handwritten notes in front of him, attached to which was a fuschia-colored Post-It which said " 'No JCATS, no three-month review, Union Aff.' "[6] Pulcino believes that she did not get a courier position because of her prior affiliation with the union, and points out that this incident occurred contemporaneously with the National Mediation Board's October 19, 1992 finding that high-level FedEx executives had unlawfully interfered with Fed-Ex pilots' vote for union representation. Pulcino and other FAs claim that antiunion sentiments were rampant at Fed-Ex at this time.

In late October 1992, shortly after she began work as a handler, Pulcino suffered a lower lumbar strain. When she provided Bailey with a medical note requesting light duty, Bailey replied that she should not come back to work until she had a full release because FedEx did not offer light-duty positions for part-time workers. When Pulcino presented a note a few weeks later informing Bailey that she was still being treated for her sprain, Bailey directed her to see Dr. Grauke, who immediately gave her a full release to resume the handler job. Pulcino claims that although her injury was still causing her pain, her supervisors ignored her repeated requests for a safety belt to protect her back.

---

obviously inappropriate for a "5'5" 120 pound former FA." Rick Birchett, the-Bothell station manager, characterized Pulcino's tasks at the Microsoft dock differently:

> Her work duties . . . consisted mainly of moving 3-5 pound packages, shrink wrapping these packages on skids, and moving the skids with forklift devices. All the other positions within my supervision, including handler, courier and customer service agent positions, required heavier lifting than would have been required at the Microsoft facility. All these positions had a lifting requirement of 75 pounds and employees in these positions occasionally handled packages up to this weight limitation as part of their regular job duties.

[6] "JCATS" is the Job Change Applicant Tracking System. Internal FedEx employees can access this system to find jobs within FedEx.

On December 18, 1992, Pulcino strained her rib muscles when she slammed the shrink-wrapping device into her chest. She left work and returned to Grauke, who put her in a rib belt and sent her back to work with a note[7] requesting light duty. Later that day, Pulcino fell over a pallet jack that someone had left behind her and broke her foot. She claims that she was unable to get up, and that no one offered her assistance until a co-worker put her on a pallet jack and pushed her to her car so that she could drive herself to the doctor. Grauke put her leg in a cast and released her for light duty the following Monday. Bailey did not alter her workload. Days later, Bailey gave Pulcino a less than satisfactory job performance review, which Pulcino feared would preclude her from moving out of the handler job. And four weeks later, Pulcino was told to report to a manager, who told her that because FedEx had no light-duty policy, he was sending her home.

On April 28, 1993, Rick Birchett, the Bothell station manager, requested permission to fill Pulcino's job, stating that he wanted her replacement to do "sort/shuttle" work. Although Birchett's summary judgment declaration indicated that he understood Pulcino did not intend to return, he later testified that he knew "the doctor was expected to return her . . . ." A few days later, Pulcino presented her full medical release. Although Birchett had just received permission to assign someone to the sort/shuttle work, he told her that the only available job was her handler position at the Microsoft dock. Birchett claims he said this because the duties at the Microsoft dock were lighter than any of the other positions he supervised.[8] Pulcino said she

---

[7]It is not clear to whom Pulcino presented this note. FedEx claims she initially testified that she gave the note to Ryan Lippencott, another handler at the Microsoft dock, but she later stated that she did not remember whether she gave the release to Lippencott or Bailey.

[8]*See supra*, note 5. A FedEx report entitled "Validation of Physical Strength Tests for the Federal Express Corporation" compared the lifting requirements of the five station jobs—Service Agents, Handlers, Couriers, Tractor/Trailer Drivers, and Shuttle Drivers—and concluded that "[l]ifting over 60 lbs. to waist height is common to all five station jobs including service agent." This report does not acknowledge variations in lifting requirements at different locations, so it does not substantiate the relative difficulty of the Microsoft handler position.

felt unable to return to the Microsoft dock because of the physical and mental trauma she had experienced there, so Birchett requested that Pulcino turn in her I.D. and report to a leave of absence (LOA) manager. Pulcino submitted a medical note to her LOA manager, Kim Woods, that stated she was authorized to return to full duty at work, but that "it would seem prudent . . . to provide her with a work assignment that does not involve extremely heavy physical demands." The note clarified that this recommendation was "on the basis of her general body habitus rather than any physical defect."

Pulcino did not find another job at FedEx within her 90-day LOA period. FedEx claims this was because she failed to submit job change applications and neglected to keep in touch with Woods when she was in California training for a job with another company. Pulcino alleges that Woods did not inform her of a single job within commuting distance and that workers could submit job change applications only through their LOA managers. At the end of 90 days, Pulcino was terminated.[9]

In August 1994, Pulcino filed a complaint in Snohomish County Superior Court alleging union discrimination, disability discrimination, and breach of promises contained in FedEx's employee handbooks.[10] At the pretrial summary judgment hearing, the court precluded Pulcino from referring to any evidence that preceded her employment as a handler and excluded all evidence of a corporate policy of antiunionism, regardless of the timing. The court also granted FedEx's motion to dismiss Pulcino's disability discrimination and breach of implied employment contract claims and limited her union discrimination claim to wrongful discharge. Pulcino's wrongful discharge claim then proceeded before a different trial judge. At the close of

---

[9]Apparently, four other FedEx FAs believe, as Pulcino does, that FedEx deliberately placed them in inappropriate jobs and then conspired to push them out of the company.

[10]Pulcino included a claim against John and Jane Doe Grauke for poor medical treatment provided in connection with her employment, but later dropped this claim.

her case, the court granted FedEx's motion for a directed verdict.[11] Pulcino filed a motion for a new. trial and reconsideration, but the motion was denied. This appeal followed.

## DISCUSSION
### 1. Union Discrimination Claim

At the close of Pulcino's case on her union discrimination claim, FedEx moved for a directed verdict under Civil Rule 50(a), arguing that there was insufficient evidence for any reasonable jury to rule in Pulcino's favor. The trial court granted the motion, finding that "there was no adverse action ever taken against Plaintiff and the procedures followed by Federal Express were appropriate." On appeal, Pulcino claims she was denied a fair trial on this claim because the trial court 1) limited her claim to wrongful termination, 2) excluded relevant evidence, 3) denied discovery of documents regarding union organizing, 4) failed to interpret reasonable inferences in her favor, and 5) refused to grant a new trial despite erroneous evidentiary rulings and FedEx's abuse of discovery. She asks this court to reinstate her claim for union discrimination in its entirety and grant judgment to her as a matter of law on her reinstated claim because "it is undisputed that FedEx excluded Gross and the other FAs from accessing information regarding job openings purely based on their union affiliation."

a. Limitation to Wrongful Termination

Pulcino contends that because the trial court limited her union discrimination claim to wrongful discharge, she was not permitted to show that she was subjected to different terms and conditions solely due to her union affiliation. In particular, she would have shown how FedEx refused to recognize her and the other FAs as employees, and excluded them, the only remaining unionized group within FedEx,

---

[11]Judge Thomas Wynne ruled on the summary judgment motion, and Judge Joseph A. Thibodeau was the trial judge. In the remainder of the opinion, we refer to the actions of both courts collectively as the "trial court."

from access to job listings. Pulcino relies on the Washington Supreme Court's decision in *Bravo v. Dolsen Companies*[12] for her argument that RCW 49.32.020 prohibits all forms of employer interference with organized workers. FedEx counters that in *White v. State*,[13] the Supreme Court limited public policy employment claims to wrongful discharge. Resolution of this issue requires examination of how the tort of wrongful discharge intersects with RCW 49.32.020, the public policy statute prohibiting employer coercion, interference, and restraint with labor organizing.

 In *Krystad v. Lau*,[14] the Washington Supreme Court decided the issue of whether RCW 49.32.020 confers substantive rights or is merely a declaration of policy. The statute provides:

> **49.32.020 Policy enunciated.** . . . The public policy of the state of Washington is hereby declared as follows:
>
> WHEREAS, Under prevailing economic conditions . . . the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor . . . wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protections; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the state of Washington are hereby enacted.

After a lengthy historical discourse, the court concluded that this statute creates actionable rights, "among which rights were that [employees] be free from coercion, interfer-

---

[12]125 Wn.2d 745, 758, 888 P.2d 147 (1995).

[13]131 Wn.2d 1, 929 P.2d 396 (1997).

[14]65 Wn.2d 827, 400 P.2d 72 (1965).

ence and restraint from and by their employers in organizing or joining a labor union and in designating such union as their agent for collective bargaining."[15] Despite criticism by commentators,[16] the court has adhered to its decision that RCW 49.32.020 is more than a prefatory policy statement.[17] In *Bravo*, the court clarified that RCW 49.32.020 prohibits not only discriminatory *discharge* of employees but also interference, restraint, or coercion with concerted activities as well:

> "[I]nterference, restraint, or coercion" has a broader meaning than "discharge". The Legislature's use of the former terms in the disjunctive suggests it intended to prohibit a wide range of actions that could operate to deprive workers of protections under the statute. Had the Legislature intended to prohibit only discriminatory discharge, it could easily have chosen to use that term. We decline to substitute the Legislature's language with a more narrow term that it . . . did not[ ] elect to use.[18]

The *Bravo* court also recognized that "a discharge which violates RCW 49.32.020 . . . gives rise to a tort of discharge in violation of a clear mandate of public policy."[19]

But the reverse is not always true. In cases where a wrongful discharge is contrary to a public policy that is not related to labor organization, RCW 49.32.020 does not apply, and the employee is limited to a tort claim. In *White*, a case unrelated to employee organization, the court held that the tort of wrongful discharge in violation of public policy does not extend to "wrongful disciplinary action less

---

[15]*Id.* at 846. Justice Hill dissented, arguing that this holding was "an inference and a conclusion tortured out of a section which is no more than a declaration of policy in a statute dealing with injunctions in labor disputes." *Id.* at 848.

[16]*See* Cornelius J. Peck, *Judicial Creativity and State Labor Law*, 40 Wash. L. Rev. 743, 775-78 (1965).

[17]*See Culinary Workers & Bartenders Union No. 596 v. Gateway Café, Inc.*, 91 Wn.2d 353, 588 P.2d 1334 (1979).

[18]125 Wn.2d at 756.

[19]*Id.* at 758.

than discharge . . . ."[20] So the permissible scope of claims against employers differs depending on whether the employee proceeds under a tort or under a statutory theory. Thus, Pulcino's argument that the court erroneously limited her claim to wrongful discharge succeeds if she brought her claim under RCW 49.32.020, but fails if she relied only on the tort of wrongful discharge.

FedEx argues that *White* applies because Pulcino's complaint did not mention RCW 49.32.020 and alleged only that FedEx's actions were "contrary to the public policy of this state."[21] This argument fails because, as Pulcino points out, "a statute not addressed below but pertinent to the substantive issues which were raised below may be considered for the first time on appeal."[22] Although she did not specifically cite RCW 49.32.020 in her complaint, Pulcino alleged facts sufficient to support a claim under the statute and she cited both it and *Bravo* in her memorandum opposing FedEx's motion for summary judgment. On appeal Pulcino is permitted to clarify that she is making a claim under RCW 49.32.020. The trial court erred in limiting her claim to wrongful discharge because *Bravo* clearly directs that employees be permitted to sue over adverse employment actions which they allege resulted from interference with and coercion of employee organization even though they did not result in discharge.

## b. Exclusion of Evidence

Pulcino also contends that the trial court erroneously excluded relevant evidence of FedEx's corporate state

---

[20]131 Wn.2d at 19.

[21]Pulcino's original complaint alleged "Subjecting persons to different terms and conditions in employment, including refusing to consider them for hiring and transfer, because of their union affiliation, is contrary to the public policy of this state." This allegation alone arguably refers to RCW 49.32.020 because it enunciates that policy.

[22]*Bennett v. Hardy*, 113 Wn.2d 912, 918, 784 P.2d 1258 (1990) (citing *State v. Fagalde*, 85 Wn.2d 730, 732, 539 P.2d 86 (1975)).

of mind and events occurring before she became a handler.[23] To prove corporate state of mind, she offered *Adams v. Federal Express Corporation*,[24] a 1979 decision enjoining FedEx from interfering with employees' right to choose a union representative, and the 1992 National Mediation Board's decision which held that CEO Smith and other high-level officers interfered with the pilot's union vote.[25]

The trial court deemed *Adams* "too remote to be relevant."[26] Pulcino argues that *Adams* is relevant despite its temporal remoteness because FedEx has the same leadership now as it did then and is still subject to the *Adams* injunction. We agree. Pulcino should have been permitted to use this case to develop her theory that FedEx has established a pattern and practice of discriminatory behavior against unions. Its very remoteness helps to establish the long-standing nature of the alleged pattern.

We also conclude that the trial court's decision to exclude the 1992 decision had no discernible basis. The court stated simply, "[a]s to the pilots, I find that that is not relevant, either . . . ." Presumably, the court perceived the pilots' situation to be different from the FAs'. But because the pilots and the FAs worked closely together, and because it is reasonable to infer that FedEx's conflict with the pilots affected its dealings with the FAs, Pulcino should have been permitted to offer this case as evidence of FedEx's corporate state of mind, and the trial court's decision to exclude it was error.

Because the court excluded all evidence which preceded Pulcino's hiring as a handler, she could not offer: 1) evi-

---

[23]We review evidentiary rulings under an abuse of discretion standard and overturn trial court rulings which are manifestly unreasonable or based on untenable grounds. *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 168, 876 P.2d 435 (1994).

[24]654 F.2d 452 (6th Cir. 1981).

[25]*In re Application of Air Line Pilots Assoc.*, 20 NMB 7, 1992 WL 509808 (NMB no. 4, Oct. 19, 1992).

[26]It cited *Roberts v. Atlantic Richfield Co.*, in which the plaintiff in a wrongful discharge action was not permitted to offer testimony of two similarly situated former employees because the former employees' circumstances did not sufficiently resemble the plaintiff's. 88 Wn.2d 887, 893, 568 P.2d 764 (1977).

dence that Smith warned employees they were subject to layoff if they were organized, 2) FedEx's inability to cite any provision in the Collective Bargaining Agreement which stated that FAs are to be treated as external candidates for jobs, 3) evidence that the FA union was the only surviving bargaining unit of the 10 that came with the Flying Tiger acquisition, 4) the short time between the FAs' decision to retain the union and FedEx's decision to furlough them, 5) CEO Smith's interest in the FAs' union decertification effort, and 6) comments by Smith to a pilot about the FA reorganization. Pulcino argues that the trial court erred in excluding all this evidence without allowing her to make an offer of proof. We agree.

Pulcino is correct that a trial court abuses its discretion when it finds potential evidence irrelevant without an offer of proof or its equivalent.[27] Based on its erroneous conclusion that Pulcino's claim was restricted to wrongful discharge, the court excluded all evidence which occurred prior to her employment as a handler at the Microsoft dock. But that is not the issue here. Because Pulcino should have been permitted to show that FedEx sought to stymie the FAs' attempts to find adequate employment within FedEx after the furlough, FedEx's allegedly antiunion pronouncements and actions are relevant. Although it is possible that not all of the evidence Pulcino seeks to offer should be admitted, the trial court erred in ordering a blanket exclusion of all evidence which preceded her final months at FedEx.[28] On remand, it should permit Pulcino to present an offer of proof on any evidence the court intends to exclude and admit evidence relevant to FedEx's corporate state of mind.

## c. Denial of Discovery

The trial court also denied Pulcino's motion to compel

---

[27]*Kramer v. J.I. Case Mfg. Co.*, 62 Wn. App. 544, 559, 815 P.2d 798 (1991).

[28]*See Riordan v. Kempiners*, 831 F.2d 690, 699 (7th Cir. 1987) ("[A] blanket exclusion of evidence of events that occurred before or after the discrimination is arbitrary.").

production of "documents relating to unions and union organizing which FedEx distributed to its managers since January 1, 1988." FedEx argued that this request was overly broad. Although the trial court denied this request without comment, it apparently agreed. CR 26(b)(1) provides that a party "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ."[29]

■ Again, it seems that the court's decision to deny this request was based on its erroneous determination that Pulcino's claim should be limited to wrongful termination from her handler position. Because we have held that Pulcino's claim includes wrongful coercion and interference, FedEx's communications with managers about its employees' union affiliations are relevant, especially given Bailey's testimony that he placed Pulcino in a handler position because that was "the information [he] got," from an unnamed supervisor. The communications Pulcino sought were not unduly burdensome given the scope of this case. The discovery, subject to any appropriate limitations, should be permitted on remand.

■ Pulcino also claims that FedEx's discovery abuses warrant a new trial under CR 59(a). In determining whether there is a discovery violation under CR 26(g), "the court should consider all of the surrounding circumstances, the importance of the evidence to its proponent, and the ability of the opposing party to formulate a response or to comply with the request."[30]

■ Pulcino alleges FedEx abused discovery rules in three instances. First, in an effort to find similarly situated FAs, she requested the last known addresses and phone

---

[29]The rule also allows the court to limit discovery: "[t]he frequency or extent of use of the discovery methods set forth in section (a) shall be limited by the court if it determines that: . . . (C) the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the party's resources, and the importance of the issues at stake in the litigation." CR 26(b)(1)(C).

[30]*Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 343, 858 P.2d 1054 (1993).

numbers of the furloughed FAs. FedEx initially refused this request, but after a rule 26(i) conference, it produced a list of addresses. But the list gave no residential addresses and had the same Los Angeles FedEx station address and phone number for 209 of the 250 FAs, many of whom had never worked in Los Angeles. For instance, Billye Senseman, an FA who Pulcino located on her own, was involved in litigation with FedEx at the time of the request, but FedEx provided the Los Angeles address for Senseman even though she had never worked there. Pulcino points out that in the 1992 NMB proceeding, FedEx claimed that it had two lists of residential addresses and phone numbers for flight crew members.

Second, Pulcino asked FedEx to identify the document which provided that FAs should be treated as external candidates for FedEx jobs. FedEx provided several vague answers, including "the Agreement . . . speaks for itself," the "union flatly rejected the offer that they be considered internal candidates for these positions," and that "post-contract negotiations" provided for this compromise, but provided no tangible evidence of any of these contradictory statements.

And third, in response to Pulcino's repeated requests for the FA handbook, FedEx's attorney assured the trial court, "It's on its way. . . . [W]e have found a flight attendant's handbook, it's being overnighted, should arrive today. It will be turned over. . . . We'll get it here as soon as possible . . . ." The handbook never arrived. Pulcino points out that she had no way of obtaining it because the FAs were required to return their handbooks in order to receive their last paycheck, and that FedEx's continued assertions about the legitimacy of its decision to treat FAs as external candidates were partially based on this handbook. These examples demonstrate that FedEx made it extremely difficult for Pulcino to access the information she needed to

develop her claim.[31] We direct the trial court to order production of these documents on remand.

## 2. Disability Discrimination Claim

Pulcino next contends that the trial court erred in granting summary judgment in favor of FedEx on her disability claim because she presented genuine issues of material fact. To support this claim, Pulcino alleges that FedEx failed to accommodate her disability, required her to work beyond her restrictions, and considered her disabled despite a medical release which stated that she was authorized to return to full duty at work. In reviewing summary judgment, this court engages in de novo review, considering all facts and reasonable inferences therefrom in the light most favorable to the moving party.[32] A material fact is one upon which the outcome of the litigation depends.[33]

■■ ■■ The Washington Law Against Discrimination[34] provides that an employer has an affirmative duty to reasonably accommodate a disabled employee, and that an employer's failure to do so constitutes unlawful discrimination.[35] The Washington Administrative Code states that a person suffers from a " 'sensory, mental, or physical handicap' if it is an abnormality and is a reason why the person having the condition did not get or keep the job in question . . . .' "[36] To meet the initial prima facie requirement, Pulcino had to produce evidence of disability and evidence that

---

[31]Pulcino points out that FedEx was reprimanded for discovery abuses in 1997. *Burnett v. Federal Express Corp.*, No. 93-2795 (W.D. Tenn. 1997). We expect that FedEx will be more forthcoming on remand. As the *Fisons* court directed, "If a [discovery] violation is found . . . then sanctions are mandated . . . ." 122 Wn.2d at 346.

[32]*Baker v. Schatz*, 80 Wn. App. 775, 782, 912 P.2d 501, *review denied*, 129 Wn.2d 1031 (1996).

[33]*Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 234, 770 P.2d 182 (1989).

[34]RCW 49.60.

[35]RCW 49.60.180; *Swinford v. Russ Dunmire Oldsmobile, Inc.*, 82 Wn. App. 401, 918 P.2d 186 (1996), *review denied*, 130 Wn.2d 1024 (1997).

[36]WAC 162-22-040.

the disability resulted in discharge.[37] In *Swinford v. Russ Dunmire Olds.*,[38] an employee injured in a motorcycle accident took a three-month leave of absence and was fired after he told his employer he had received a full medical release to return to work. He sued, alleging disability discrimination, and this court held that his temporary injuries did not support a claim under the statute.[39] Though the court "sympathize[d]"[40] with his situation, it could provide no relief because the plaintiff had "introduced no medical evidence of a handicap," and "failed to establish a handicapping condition."[41] Federal courts in Washington similarly hold that extended disability leave followed by a full medical release does not constitute a disability.[42]

▮▮▮ Pulcino contends that a person is entitled to protection under RCW 49.60 if a disability "is perceived to exist, whether or not it exists in fact."[43] As an example of a perceived disability, the WASHINGTON ADMINISTRATIVE CODE offers "rejection of a person for employment because he had a florid face and the employer thought he had high blood pressure . . . ."[44] Pulcino's argument fails because she offers no evidence that FedEx perceived her as disabled. Even if her doctor's recommendation that she be spared "extremely heavy physical demands" because of her "general body habitus" caused her LOA manager not to consider her for jobs which required heavy lifting, disparate treatment because of body size does not render an employee dis-

---

[37]*Swinford*, 82 Wn. App. at 414-15.

[38]82 Wn. App. 401, 406, 918 P.2d 186 (1996), *review denied*, 130 Wn.2d 1024 (1997).

[39]*Id.* at 415.

[40]*Id.*

[41]*Id.*

[42]*Calhoun v. Liberty N.W. Ins. Corp.*, 789 F. Supp. 1540, 1547 (W.D. Wash. 1992). Federal decisions are persuasive in construing RCW 49.60. *Clarke v. Shoreline Sch. Dist. No. 412*, 106 Wn.2d 102, 118, 720 P.2d 793 (1986).

[43]*See* WAC 162-22-040(b).

[44]WAC 162-22-040.

abled. Accordingly, the trial court properly granted FedEx's motion for summary judgment.

Because the trial court erred in limiting Pulcino's union discrimination claim to wrongful discharge and that limitation resulted in several erroneous evidentiary and discovery rulings, we reverse the trial court's entry of a directed verdict against Pulcino and reinstate her claim. We affirm its ruling dismissing her disability discrimination claim.

KENNEDY, C.J., and BAKER, J., concur.

Review granted at 139 Wn.2d 1001 (1999).